## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SHARON PIPER, | : | |
| Plaintiff | : | Civil Action No. 3:11-cv-03160 (JAP) (DEA) |
| | : | |
| v. | : | |
| | : | |
| BRISTOL-MYERS SQUIBB CO., | : | *Document Electronically Filed* |
| Defendant | : | |
| | : | |

## PLAINTIFF SHARON PIPER'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BRISTOL-MYERS SQUIBB COMPANY'S MOTION FOR SUMMARY JUDGMENT

**KOLLER LAW, P.C.**
By: David M. Koller, Esq.
2043 Locust Street, Suite 1B
Philadelphia, PA 19103
(T) 215-545-8917
(F) 215-575-0826
*Attorney for Plaintiff Sharon Piper*

Dated: February 26, 2013

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT.................................................................1

II.  STATEMENT OF FACTS..................................................................2

    A.  Plaintiff's Biographical and Educational Background and Work History
        Prior to Working for Defendant...................................................2

    B.  Defendant Hired Plaintiff as an ImmunoScience Executive Territory
        Business Manager...................................................................3

    C.  Defendant Promoted Plaintiff to the Manager of Oncology Training
        Position in Princeton, New Jersey in 2007.....................................4

    D.  Plaintiff Exceeded Expectations in the Manager of Oncology Training
        Position...............................................................................5

    E.  From February 2008 Through August 2010, Plaintiff Applied for Twenty-
        Five Positions and Defendant Rejected Her from All of Them..........................11

    F.  After Defendant Rejected Plaintiff for Three Positions, Two of Which
        Were Given to Younger Candidates, Plaintiff Contacted HR on October
        9, 2008...............................................................................16

    G.  Defendant Retaliated Against Plaintiff After She Reported Her Concerns
        to HR that Younger Candidates Were Selected Over Her.........................17

    H.  Despite the Harassing Treatment Plaintiff Faced, She Continued to Achieve.........22

    I.  Plaintiff Was Qualified for the Positions at Defendant for Which She Applied.......25

        1.  Plaintiff Applied for an MSL Trainer Position in July 2009 for Which
            She Was Qualified, but Defendant Rejected Her................................26

        2.  Plaintiff Applied for a Specialty Account Executive Position in
            September 2009 for Which She Was Qualified, but Defendant
            Rejected Her......................................................................27

        3.  Plaintiff Applied for a Manager of Medical Strategy Position in January
            2010 for Which She was Qualified, but Defendant Rejected Her..............28

4.  Plaintiff Applied for an Associate Director of REMS Medical Strategy Position in August 2010 for Which She was Qualified, But Defendant Rejected Her...................................................................................29

J.  Plaintiff Filed Two Charges of Discrimination with the EEOC..........….............30

K.  Novartis Offered Plaintiff a Job.......................................................…....31

III.  ARGUMENT.....................................................................................32

A.  Summary Judgment Standard....................................................................32

B.  Summary Judgment is Inappropriate as to Plaintiff's Age Discrimination Claims (Counts I and III)........................................................................34

1.  Legal Framework for Analyzing Plaintiff's Discrimination Claims...............34

2.  Plaintiff Has Established a *Prima Facie* Case of Discrimination....................35

3.  Defendant's Stated Reasons for Its Repeated Failures to Hire Plaintiff are Pretextual...................................................................39

a.  Plaintiff Has Pointed to Evidence by Which a Fact Finder Could Reasonably Disbelieve the Employer's Articulated Non-Discriminatory Reason................................................41

b.  There is a Genuine Issue of Material Fact Regarding Defendant's Motive for Its Repeated Failures to Hire........................42

C.  Summary Judgment is Inappropriate as to Plaintiff's Retaliation Claims (Counts II and III)................................................................................43

1.  Legal Framework for Analyzing Plaintiff's Retaliation Claims......................43

2.  Plaintiff Has Established a Prima Facie Case of Retaliation............................44

a.  Plaintiff Engaged in Protected Activity When she Complained to HR and Also When She Filed an EEOC Charge..............................44

b.  Defendant Subjected Plaintiff to Materially Adverse Actions............45

c.  A Causal Link Exists Between Plaintiff's Protected Activity and Defendant's Adverse Employment Actions...................................46

3.  Defendant's Stated Reason for Its Disciplinary Actions is Both Pretextual and Discriminatory.........................................................47

ii

D. The Court Should Deny Summary Judgment on Defendant's Counterclaims............48

    1. Plaintiff Has Not Defaulted on Defendant's Counterclaims............................48

    2. Defendant's Motion for Summary Judgment Should be Denied on
       Its Counterclaims.............................................................................................50

VI. CONCLUSION...............................................................................................................50

# TABLE OF AUTHORITIES

## CASES

Anderson v. Baxter Healthcare Corp.,
    13 F.3d 1120 (7th Cir.1994)......................................................................................40, 41

Andersen v. Exxon Co.,
    89 N.J. 483, 446 A.2d 486 (1982)....................................................................................40

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..........................................................................................................33

Bergen Commercial Bank v. Sisler,
    157 N.J. 188 (1999)..........................................................................................................34

Bray v. Marriott Hotels,
    110 F.3d 986 (3d Cir. 1997)......................................................................................41, 42

Carter v. Exxon Co.,
    177 F.3d 197 (3d Cir. 1999)......................................................................................32, 33

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)..........................................................................................................32

Davis v. Township of Paulsboro,
    371 F.Supp.2d 611 (D.N.J. 2005)....................................................................................33

Erickson v. Marsh & McLennan Co.,
    117 N.J. 539, 569 A.2d 793 (1990)..................................................................................35

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
    983 F.2d 509 (3d Cir.1992)..............................................................................................40

Farnese v. Bagnasco,
    687 F.2d 761 (3d Cir. 1982)............................................................................................49

Farrell v. Planters Lifesavers Co.,
    206 F.3d 21 (3d Cir. 2000)........................................................................................37, 38

Feliciano v. Reliant Tooling Co., Ltd.,
    691 F.2d 653 (3d Cir. 1982)............................................................................................49

Gold Kist, Inc. v. Laurinburg Oil Co., Inc.,
    756 F.2d 14 (3d Cir. 1985)..............................................................................................49

iv

Goodman v. Mead Johnson & Co.,
    534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977)......................................33

Harad v. Aetna Cas. & Sur. Co.,
    839 F.2d 979 (3d Cir.1988)..............................................................................................49

Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,
    90 F.3d 737 (3d Cir. 1996)..............................................................................................32

Jackson v. University of Pittsburgh,
    826 F.2d 230 (3rd Cir. 1987), *cert. denied*, 484 U.S. 1020 (1988)....................................33

Jalil v. Avdel Corp.,
    873 F.2d 701 (3d Cir. 1989).............................................................................................46

Kautz v. Met-Pro Corp.,
    412 F.3d 463 (3d Cir. 2005).............................................................................................35

Krouse v. Am. Sterilizer Co.,
    126 F.3d 494 (3d Cir. 1997).............................................................................................46

Marzano v. Computer Science Corp. Inc.,
    91 F.3d 497 (3rd Cir. 1996).............................................................................................33

Medunic v. Lederer,
    533 F.2d 891 (3d Cir.1976)..............................................................................................49

Moore v. City of Philadelphia,
    461 F.3d 331(3d Cir. 2006)..........................................................................................43, 45

Pivirotto v. Innovative Systems, Inc.,
    191 F.3d 344 (3d Cir. 1999)............................................................................................36

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)........................................................................................................34

Roach v. American Radio Systems Corp.,
    80 F. Supp. 2d 530 (W.D. Pa. 1999)............................................................................36, 37

Romano v. Brown & Williamson Tobacco Corp.,
    665 A.2d 1139 (N.J. Super. Ct. App. Div. 1995)..........................................................40, 44

Shellenbereer v. Summit Bancorp, Inc.,
    318 F.3d 183 (3d Cir. 2003).............................................................................................46

v

Washington v. Garrett,
    10 F.3d 1421 (9th Cir.1993)............................................................................................40

Weston v. Pennsylvania,
    251 F.3d 420 (3d Cir. 2001)..........................................................................................44

Williams v. Phila. Hous. Auth. Police Dep't,
    380 F.3d 751 (3d Cir. 2004)...........................................................................................46

## STATUTES

29 U.S.C. § 623(d).................................................................................................................44, 45

*N.J.S.A* § 10:5-12.......................................................................................................................34

## OTHER AUTHORITIES

Fed. R. Civ. P. 55(c)..................................................................................................................49

Fed. R. Civ. P. 56(c)..................................................................................................................32

Fed. R. Civ. P. 60(b).............................................................................................................48, 49

Plaintiff Sharon Piper (hereinafter "Plaintiff"), by and through her counsel, hereby submits this Memorandum of Law in opposition to Defendant Bristol-Myers Squibb Company's (hereinafter "Defendant" or the "Company) Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.   PRELIMINARY STATEMENT

Defendant's Motion for Summary Judgment should be denied.  As explained in detail herein, there are genuine issues of material fact in dispute.

Plaintiff alleges age discrimination in her employment with Defendant and retaliation in violation of the ADEA and NJLAD. Plaintiff has set forth detailed facts supporting her claims, which are specified within Plaintiff's Counter-Statement of Material Facts.    Specifically, Plaintiff applied for a total of twenty-five (25) positions throughout the Company from February 2008 through August 2010.  SUF ¶ 49.  Plaintiff was qualified for each of these twenty-five (25) positions.  Defendant contends that Plaintiff was not qualified for certain positions for which she applied.

The twenty-five (25) positions for which Plaintiff applied are as follows:

(1) Associate Director, Learning Solutions;
(2) Associate Director of Business Alliance;
(3) DBM Neuroscience;
(4) Reimbursement Specialist – Atlanta, Georgia;
(5) Manager, Promotion Compliance;
(6) MSL Trainer;
(7) Associate Product Manager;
(8) Associate Director, Training;
(9) Manager Institutional Operations;
(10) Learning Manager, Hopewell;
(11) ImmunoScience/Oncology Representative, Hawaii;
(12) Specialty Account Manager – Charlotte, North Carolina;
(13) Specialty Account Manager – Philadelphia, Pennsylvania;
(14) Breast Cancer Oncology Representative – New Jersey;
(15) Neuroscience Representative – Newark, New Jersey;
(16) DBM Oncology – Michigan;

(17) Associate Manager of Regional Operations;
(18) MSL Trainer;
(19) Reimbursement Specialist;
(20) Specialty Account Executive;
(21) Manager Medical Strategy;
(22) Melanoma Specialist;
(23) Melanoma Specialist;
(24) Associate Director, REMS Medical Strategy; and
(25) Associate Director, Scientific Communications.

SUF ¶¶ 49-113.

Defendant has a record of Plaintiff applying for twenty-one (21) of these positions. Defendant claims eighteen (18) of the twenty-one (21) positions were filled and that three (3) positions were closed before finding a successful candidate. Defendant did not select Plaintiff for any of the eighteen (18) positions for which Defendant has record of her applying and which were ultimately filled. SUF ¶¶ 49- 113. It is undisputed that Defendant hired an employee younger than Plaintiff for fourteen (14) of these eighteen (18) positions. Id. Plaintiff suffered adverse employment actions after she complained about Defendant's hiring practices to Human Resources and filed a Charge of Discrimination with the EEOC.

As a result, Plaintiff filed a four (4) count Complaint in the United States District Court for the District of New Jersey based on federal subject matter jurisdiction over the Age Discrimination in Employment Act of 1967 ("ADEA") claim.

## II.   STATEMENT OF FACTS

### A. Plaintiff's Biographical and Educational Background and Work History Prior to Working for Defendant.

Plaintiff is a fifty-four (54) year old female. SUF ¶ 1. She graduated from the University of Scranton 1979 with Bachelor's degrees in chemistry and biology. SUF ¶ 2. In 1981, Plaintiff graduated with an M.S. in Engineering Management and advanced degrees in Technology Marketing Management and Research and Development from Drexel University. SUF ¶ 3. In

2

1995, Plaintiff graduated from Loyola University School of Law with a juris doctorate (JD). SUF ¶ 4.

From 1983 through 1986, Ciba-Geigy Pharmaceutical Company employed Plaintiff as a Clinical Conference Manager/Hospital Representative/District Trainer. SUF ¶ 5. From 1986 through 1989, Roche Laboratories employed Plaintiff in the following positions: Specialty Pharmaceutical Representative/District Trainer and Hospital Representative. SUF ¶ 6. From 1997 through November 2005, Pfizer Oncology employed Plaintiff in the following positions: Cardiovascular Consultant/District Trainer (November 1997 – December 2000); Institutional Sales Consultant/District Trainer (January 2001 – February 2002); and Oncology Senior Therapeutic Specialty Consultant (March 2002 – November 2005). SUF ¶ 7.

### B. Defendant Hired Plaintiff as an ImmunoScience Executive Territory Business Manager.

On or about October 18, 2005, Defendant hired Plaintiff as an ImmunoScience Executive Territory Business Manager/District Sales Trainer. This position is an Executive Sales Representative position. It reflects that Defendant had a high level of confidence in Plaintiff's professional capabilities. SUF ¶ 8. Plaintiff's start date was around November 14, 2005. SUF ¶ 10. Plaintiff was between the ages of forty-seven (47) and fifty-three (53) during the ensuing series of facts and circumstances which form the basis of her Complaint. SUF ¶ 1.

When first hired at Defendant, Plaintiff's job responsibilities consisted primarily of marketing the rheumatoid arthritis drug Orencia® to hospitals and local rheumatologists during the drug's product launch throughout 2006. SUF ¶ 11. During this time, Plaintiff reported to Amy Johnston ("Ms. Johnston"). SUF ¶ 12. Ms. Johnston conducted an evaluation of Plaintiff

3

and ranked Plaintiff as "Fully Performing" or "Exceeding" all of the "Core BMS Behaviors"[1] for 2006. Id. It is undisputed that Plaintiff met or exceeded all of Defendant's Core Behaviors in her 2006 Year-End Assessment and Evaluation. SUF ¶¶ 12-13.

## C. Defendant Promoted Plaintiff to the Manager of Oncology Training Position in Princeton, New Jersey in 2007.

Plaintiff excelled in her role as ImmunoScience Executive Territory Business Manager. Defendant asked Plaintiff to apply for the position of Manager Oncology Training. SUF ¶ 14. She applied and felt qualified for the position because of her five (5) years of sales experience in Oncology. SUF ¶ 15. As Chuck Petrozzini ("Mr. Petrozzini"), Defendant's Associate Director, L&OD, Oncology wrote in a document titled "Announcement" and dated March 19, 2007, "Sharon's past experiences will make her a great addition to the Oncology L&OD team." Id.

On or about February 22, 2007, Defendant promoted Plaintiff to the position of Manager of Oncology Training in Princeton, New Jersey. SUF ¶ 16. Plaintiff's promotion included an increase in base salary of approximately $10,000—from $125,000 to $135,756—or nearly ten (10) percent of Plaintiff's salary at the time. SUF ¶ 17.

When Plaintiff was first promoted to the position of Manager of Oncology Training, she reported directly to Mr. Petrozzini. SUF ¶ 18. Mr. Petrozzini wrote in the March 19, 2007 "Announcement" of his pleasure on the appointment of Plaintiff to this role. SUF ¶ 19. He further wrote that "for the past 15 months with BMS, [Plaintiff] *excelled* in her role as Executive TBM/District Sales Trainer where she successfully launched Orencia® in the central PA market." Id. She was doing a great job.

Defendant assigned Plaintiff the lead role for training of the drug Sprycel® in her new role. SUF ¶ 20. Defendant also assigned Plaintiff the task of assisting in the launch of

---

[1] Defendant defines its "Core BMS Behaviors" as follows: (1) Leads Strategically; (2) Builds Alignment; (3) Communicates Directly; (4) Drives Performance; (5) Collaborates; and (6) Energizes Others. SUF ¶ 12.

Ipilimumab, a drug scheduled to launch in the fourth quarter of 2010. SUF ¶ 20. The launch of Ipilimumab was very important to Defendant. SUF ¶ 21. Therefore, Defendant closely monitored Plaintiff's performance. Id. In her new role, Plaintiff was also responsible for the core curriculum review for new Oncology representatives, and the ongoing development of current representatives with expanded disease state and product knowledge as well as specialty selling skills. SUF ¶ 22. At the time, Defendant entrusted her with training staff and working interpersonally with her colleagues on important projects.

### D.  Plaintiff Exceeded Expectations in the Manager of Oncology Training Position.

During her time as the Manager of Oncology Training Division, Plaintiff exceeded job performance expectations. Defendant presented Plaintiff with two "Spot Awards" in July and August of 2007. SUF ¶ 30. The first award recognized Plaintiff for her dedication to developing people and energizing others. Id. The second award also recognized Plaintiff for her efforts to develop others. Id.

In addition to those documented awards, Plaintiff's performance was evaluated positively. SUF ¶ 31. In her 2007 Year-End Assessment & Evaluation dated November 15, 2007, Mr. Petrozzini ranked Plaintiff as "Fully Performing" or "Exceeding" in all categories of "Core BMS Behaviors." Id. In the narrative section of this 2007 Year-End Evaluation, Mr. Petrozzini wrote, "[Plaintiff] has gained the trust and respect of the ipi team as she . . . earns their valuable time for her projects. The team knows the depth of her experience in immunotherapy, shown with her successful launch of Orencia . . . ." SUF ¶ 32. He further noted that Plaintiff "serves as the 'go to' person for oncology disease state and sales experience and learnings from field activity, having earned her team's respect." Id. She clearly was performing well, and achieving significant and documented praise.

5

The documented praise was not just limited to Plaintiff's substantive work. Defendant also praised Plaintiff for her interpersonal skills. Alan L. Tubbs ("Mr. Tubbs"), Executive Director U.S. Market Access at Defendant, Princeton, New Jersey, wrote in an email to Plaintiff after she submitted a resume to him for consideration of various promotional opportunities that "I have heard good things about your contribution to BMS." SUF ¶ 35.

Around the beginning of 2008, Plaintiff told Mr. Petrozzini that she had an interest in applying to other positions throughout Defendant. SUF ¶ 37.

Unarguably, Plaintiff was motivated by financial concerns—like so many of her coworkers at Defendant—to apply for various positions throughout the Company for which she believed she was qualified. SUF ¶ 27. Part of Plaintiff's financial concerns included the decreasing value of the home she purchased when she relocated to New Jersey for the Manager of Oncology Training position. SUF ¶ 28. After the 2008 burst in the housing market, Plaintiff took a significant loss on the value of her home. Id. Plaintiff was also motivated to apply to various positions throughout Defendant for which she was qualified because of concern that Defendant was downsizing. SUF ¶ 29. Also, her $25,000 annual bonus was no longer protected and guaranteed.[2]

Mr. Petrozzini attempted to assist Plaintiff in the process of seeking other jobs within Defendant. Specifically, in an email from Mr. Petrozzini to Dennis Buckley ("Mr. Buckley"), dated February 15, 2008, Mr. Petrozzini recommended Plaintiff for the role of Associate Director of Business Alliance. He wrote:

---

[2] Because incentive compensation for field positions is typically more lucrative than for home office roles, BMS offered Plaintiff bonus protection under the Guaranteed Incentive Compensation Program ("Guaranteed IC Program"). SUF ¶ 24. Under this program, BMS offered Plaintiff bonus protection of $25,000 for the first two (2) years of her employment in her home office role, from February 2007 through February 2009. SUF ¶¶ 25-26. Once Plaintiff was no longer guaranteed a bonus under the Guaranteed IC Program, and after the major economic crisis of 2008, Plaintiff began to apply for positions throughout BMS. SUF ¶ 27.

I hope you found Sharon to exemplify these core BMS behaviors.  Sharon received an *Exceeding* rating on her year-end review for the behavior, Drives Performance, as I wrote that she 'consistently delivers on commitments while upholding the HIGHEST standards of integrity.' Her overall accomplishments with me on the L&D team were numerous. This is not surprising, as Sharon has a resume full of examples in this behavior with her numerous experiences. Communicates Directly is a behavior Sharon demonstrates on a daily basis by communicating facts and thoughts with clarity and honesty. As I wrote on her year end review, 'Sharon has always exhibited the courage to speak upon issues and risks as well as the good news.' She always demonstrates unyielding integrity and compassion. As you were the Sprycel point in 2007, Sharon interfaced with you during the managers meeting and the POA and I believe that you have witnessed her ability to communicate directly and professionally in all situations.

My work experience with Sharon has been very productive, professional, and pleasant. Sharon has raised the bar and educated my other L&D team members with her Oncology experience. She is very self driven and goes above and beyond. I am certain you will find the same when she works with you as an ADBA.

SUF ¶ 33 (emphasis in original).  Similarly, in an email from Mr. Petrozzini to Michael Peapos

("Mr. Peapos"), dated February 15, 2008, Mr. Petrozzini yet again recommended Plaintiff for the

role of Associate Director of Business Alliance. He wrote:

I hope you found Sharon to exemplify the core BMS behaviors and share examples. Sharon received a Fully Performing rating on her year-end review for the behavior, Energizes others as I wrote that she 'has a **strong example of work ethic**, as well as remaining cheerful while balancing **multiple workload** shifts across various oncology brands. She has assisted team members to accomplish their tasks.' Her overall accomplishments in L&D were numerous. This is not surprising, as Sharon has a resume full of examples in this behavior.

Develops People is an attribute that Sharon demonstrates on a daily basis as ranked Fully Performing in her year-end review by 'being instrumental in the development of training and of other department co-workers to meet tight deadlines.' Sharon consistently seeks feedback and responds to coaching. She is very open to coaching. She has been a pleasure to work with this past year.

SUF ¶ 34 (emphasis in original).

Another employee of Defendant, Michael A. Salerno ("Mr. Salerno"), also recommended

Plaintiff for an Associate Director Position of Business Alliance which she applied to in or

around February 2008. By way of example, in an email exchange between Mr. Salerno and Mr.
Petrozzini dated February 8, 2008, Mr. Petrozzini wrote, "I believe Sharon would be a good fit
for this role. She has an *outstanding* resume, is *very* self motivated and is totally committed to
drive performance." Mr. Salerno responded that he "agree[d] that Sharon would be a great fit for
the ADBA position." SUF ¶ 36.

Besides that position, Mr. Petrozzini recommended Plaintiff for other positions,
including, but not limited to, the position of MSL Trainer Position to which Plaintiff applied in
or around May 2008. In an email to Kim Conrad, dated April 22, 2008, Mr. Petrozzini wrote:

> [M]y work experience with Sharon has been very productive, professional and
> pleasant. She is very-self driven and goes above and beyond. Your position's
> emphasis on development of people while leading strategically to drive
> performance supports some of Sharon's strongest capabilities as she has applied
> herself to embrace and demonstrate the BMS core behaviors. Her unique
> educational platform and twenty years in this industry have prepared her well to
> accept new challenges when presented.

SUF ¶ 37.

Still other of Defendant's employees, including, but not limited to, Kim Conrad ("Ms.
Conrad"), Bill Ahern ("Mr. Ahern"), Director of Specialty Training, and Valerie Reister ("Ms.
Reister"), Human Resources, recommended Plaintiff for the MSL Training position to which she
applied in or around May 2008. SUF ¶ 38. In an email dated April 22, 2008, Ms. Conrad wrote
to Mr. Petrozzini, "I did meet with Sharon yesterday and also feel she is a very strong candidate
for the position [of MSL Training]." Id. Similarly, in an email dated May 25, 2008, Bill Ahern
sent a letter to Plaintiff in which he wrote, "Sharon, I support you for this position based on your
performance and demonstrated strengths in L&D." Id. Finally, in an email dated May 27, 2008,
Ms. Reister wrote to Plaintiff, "I am in full support of you posting for the MSL Trainer position."
Id.

8

Beyond recommendations for various positions at Defendant, Plaintiff's coworkers consistently thanked her for her assistance in going above and beyond, and her ability to craft creative solutions. SUF ¶ 39. By way of example, in an email dated May 14, 2008, Tinamarie Duff of Defendant wrote to Plaintiff, "Sharon, I would just like to formally thank you for the time you've carved out this week and last to assist me with getting ready for the Sprycel Track 2 class. I find your training approach very helpful." Id. Similarly, in an email dated October 22, 2008, Mr. Ahern wrote to Barbara Felice, Sharon Piper, and Chuck Petrozzini, "Sharon, thanks for taking on this additional role to assist the MM AEs. We appreciate your expertise and commitment to our important work." Id. Finally, in an email dated November 14, 2008, Peter Browne of Defendant wrote to Plaintiff, "Sharon, Didn't always seem you could fit the square peg in the round hole and make this work, but you have. Thank you!" Id.

Plaintiff also received glowing recommendations from colleagues for her superior performance and "unique educational platform." Id. Nevertheless, on or about November 20, 2008, Custom Learning Designs ("CLD"), a third-party vendor that Defendant contracted with to assist in preparing training modules, contacted Plaintiff's manager at the time, Mr. Petrozzini, to discuss differences in opinion over the content of training materials. SUF ¶ 40. Upon hearing of CLD's dissatisfaction, Plaintiff took immediate corrective steps. SUF ¶ 41. Plaintiff contacted Ms. Reister. In a letter dated November 20, 2008, Plaintiff wrote to Ms. Reister,

> For the dollars spent in creating these learning systems, a high standard *must* be established. My upholding standards throughout 2008 all derive from the personal accountability mandate that was delivered by senior management to all BMS employees early this year . . . .

SUF ¶ 41. The disagreement was a basic one: Plaintiff demanded from CLD a higher quality of writing; CLD was not accustomed to delivering this high quality of writing. SUF ¶ 41.

9

In support of Plaintiff, Dr. Robert Petit, Ph.D. ("Dr. Petit"), Director of Medical Strategy at Defendant, wrote a raving review for Plaintiff.  SUF ¶¶ 42.  In her Year End Multi-Source Evaluation dated November 22, 2008, Dr. Petit wrote on this matter pertaining to CLD:

> Sharon did an excellent job in facilitating the re-working of inadequate training materials developed by the vendor [CLD] for the MSL and Sales training modules of ipilimumab.  Sharon worked very closely with me and my team as we had to invest many many hours to edit, modify, and develop critical content for the training modules in order to make them acceptable for use.  To her credit I was not easy to get in touch with because of competing commitments for my time.  Sharon drove my performance on this project with her persistence and once I realized the magnitude of the problem (inadequate MSL and Sale training modules from the vendor) she partnered with me and my team and lead [sic] the efforts to correct the problem.
>
> Sharon really exhibited extraordinary dedication and communication skills as we had to set up multiple meetings and conference calls with the vendor in order to get the training materials corrected.   As they were initially developed, I considered these materials not only inadequate, but if they had not been revised (through great effort on Sharon's party) our field staff would have been so poorly educated as to put patient safety at risk!  Sharon really worked hard to communicate directly and effectively with my team and pushed us to meet deadlines that were really a stretch considering how busy my team was with other activities.  Sharon was the driving force behind the correction, editing, and final development of these modules, overcoming a largely inadequate initial output from the vendor, to rework the modules into acceptable shape to support the US and EMEA filing of ipilimumab.   Sharon's hard work and persistence significantly reduced a very real safety risk for patients and the company.

Id.  In fact, all three of the reviewers for Plaintiff's Year End Feedback Form for 2008—Dr. Petit, Maria Karasarides ("Ms. Karasarides"), and Yen Krystal Miao ("Ms. Miao")—yet again ranked Plaintiff as "Exceeding" or "Fully Performing" in all areas of Core BMS Behaviors.  SUF ¶¶ 42-44.

Despite the initial dispute with CLD over these training materials, CLD came to embrace Plaintiff's unique educational style.  In fact, CLD later nominated Plaintiff in 2009 for a Brandon Hall Excellence Award for excellence in e-learning training material.  SUF ¶ 45.  Plaintiff ultimately earned the Bronze Brandon Hall Award for 2009 for "Best Custom Content."  Id.  In

its April 2010 USP T&D Newsletter, Defendant featured Plaintiff's then supervisor, Keith Zajdowicz ("Mr. Zajdowicz"), presenting this plaque to Plaintiff. Id. In fact, CLD was so happy with Plaintiff's work that in June 2010 they nominated her for the Association of Medical Illustrators Salon Award. In an email from Stacey Betts ("Ms. Betts") at CLD to Plaintiff, dated June 8, 2010, Ms. Betts wrote, "Due to the success of the Online Module 1/2 of the Ipilimumab Learning System as a Brandon Hall award winner, CLD is interested in entering the other online module, Online Module 3 . . . ." SUF ¶ 47.

### E. From February 2008 Through August 2010, Plaintiff Applied for Twenty-Five Positions and Defendant Rejected Her from All of Them.[3]

From February 2008 through August 2010, Plaintiff applied for a total of twenty-five (25) positions throughout Defendant. SUF ¶ 49. She was not selected for any of them. It is these failures to promote that form the basis of Plaintiff's claims. The positions are chronologically outlined in this section.

In February 2008, Plaintiff applied for the Associate Director of Learning Solutions. SUF ¶ 50. Defendant rejected Plaintiff for this position. SUF ¶¶ 51-52. The candidate selected for the position of Associate Director of Learning Solutions was Ms. Eileen Dormuth. SUF ¶ 52. Ms. Dormuth was fifty-three (53) years old at the time, three (3) years older than Plaintiff. Id.

In February 2008, Plaintiff applied for the Associate Director of Business Alliance. SUF ¶ 53. Mr. Petrozzini and Michael Salerno both recommended her for this position. SUF ¶ 34. Defendant rejected Plaintiff for this position. The candidate selected was Paul Liberty ("Mr. Liberty"). SUF ¶¶ 54-55. Mr. Liberty was fifty (50) years old at the time, the same age as Plaintiff. SUF ¶ 55.

---

[3] Defendant contends that only eight of the positions to which Plaintiff applied and was rejected are not time-barred. Plaintiff's contention is that any positions which are time-barred as claims are relevant to Plaintiff's timely claims in that they create an inference of age discrimination.

11

In or around March 2008, Plaintiff applied for the position of DBM Neuroscience. SUF ¶ 56. Defendant rejected Plaintiff for this position. SUF ¶ 57. The candidate selected for the DBM Neuroscience position was Kevin DeLaney ("Mr. DeLaney"). SUF ¶ 58. Mr. DeLaney was forty-six (46) years old at the time, four years *younger* than Plaintiff. Id.

In or around March 2008, Plaintiff applied for the position of Reimbursement Specialist based in Atlanta, Georgia. SUF ¶ 59. Defendant claims to have no record of Plaintiff applying. SUF ¶ 60. Defendant did not provide the name of the successful candidate. Defendant also did not provide the age of the successful candidate.

In or around May 2008, Plaintiff applied for the position of Manager, Promotion Compliance. SUF ¶ 61. Defendant rejected Plaintiff for this position. SUF ¶ 62. The successful candidate for the DBM Neuroscience position was Twyla Nicole Thompson ("Ms. Thompson"). SUF ¶ 63. Ms. Thompson was twenty-five (25) years old at the time, twenty-five (25) years *younger* than Plaintiff. Id.

In or around May 2008, Plaintiff applied for the MSL Trainer position. SUF ¶ 64. In support of Plaintiff's application, Mr. Petrozzini wrote Plaintiff a glowing recommendation about his positive work experiences with Plaintiff. SUF ¶ 37. Other employees of Defendant, including, but not limited to, Ms. Conrad, Mr. Ahern, and Ms. Reister recommended Plaintiff for the position. SUF ¶ 38. Defendant rejected Plaintiff for this position. SUF ¶ 65. The successful candidate for the MSL Trainer position was Ivy H. Li ("Ms. Li"). SUF ¶ 66. Ms. Li was thirty-four (34) years old at the time, sixteen (16) years *younger* than Plaintiff. Id.

In or around June 2008, Plaintiff applied for the position of Associate Product Manager. SUF ¶ 67. Defendant rejected Plaintiff for this position. SUF ¶ 68. The selected candidate for the position of Associate Product Manager was Bernard Komorosk ("Mr. Komorosk"). SUF ¶

12

69. Mr. Komorosk was thirty-two (32) years old at the time, eighteen (18) years *younger* than Plaintiff. Id.

In or around June 2008, Plaintiff applied for the position Associate Director, Training. SUF ¶ 70. Defendant claims to have no record of Plaintiff applying. SUF ¶ 71. Defendant did not provide the name of the successful candidate. Defendant also did not provide the age of the successful candidate.

In or around July 2008, Plaintiff applied for the position of Manager of Institutional Operations. SUF ¶ 72. Defendant rejected Plaintiff for this position. SUF ¶ 73. The successful candidate for the position of Manager of Institutional Operations was Bryan Kraus ("Mr. Kraus"). SUF ¶ 74. Mr. Kraus was twenty-eight (28) at the time, which was twenty-two (22) years *younger* than Plaintiff. Id.

In or around September 2008, Plaintiff applied for the Learning Manager position based in Hopewell. SUF ¶ 75. Defendant rejected Plaintiff for this position. SUF ¶ 76. The successful candidate for the position of Learning Manager was Erica Elefant ("Ms. Elefant"). SUF ¶ 77. Ms. Elefant was forty (40) years old at the time, ten (10) years *younger* than Plaintiff. Id.

In or around October 2008, Plaintiff applied for a position as an ImmunoScience/Oncology Representative based in Hawaii. SUF ¶ 78. Defendant rejected Plaintiff for this position. SUF ¶ 79. The selected candidate for the position of ImmunoScience/Oncology Representative was Cythia Kubas ("Ms. Kubas"). SUF ¶ 80. Ms. Kubas was fifty-two (52) years old at the time, two years older than Plaintiff. Id.

In or around October 2008, Plaintiff applied for the position of Specialty Account Manager based in Charlotte, North Carolina. SUF ¶ 81. Defendant rejected Plaintiff for this position. SUF ¶ 82. The candidate selected for the position of Specialty Account Manager was

13

Amy Frenzel ("Ms. Frenzel").  SUF ¶ 83. Ms. Frenzel was forty (40) years old at the time, ten (10) years *younger* than Plaintiff.  Id.

In or around October 2008, Plaintiff applied for the position of Specialty Account Manager based in Philadelphia, Pennsylvania. SUF ¶ 84.  Defendant rejected Plaintiff for this position. SUF ¶ 85.  The selected candidate was Michael Evans ("Mr. Evans").  SUF ¶ 86. Mr. Evans was forty-nine (49) years old, which was one (1) year *younger* than Plaintiff. SUF ¶ 86.

In or around November 2008, Plaintiff applied for the Breast Cancer Oncology Representative position based in New Jersey. SUF ¶ 87. Ms. Reister expressed her belief that Plaintiff was qualified for this position.  SUF ¶ 88.   In an email dated December 17, 2008, she wrote to Plaintiff, "I am looking into why you were not selected to go to second rounds and gain an understanding on why we would go external for this spot . . . . [Y]ou are *obviously qualified* to do a sales rep role in Oncology . . . ."  Id.  Despite an endorsement and bewilderment over the non-selection by Defendant's own HR manager, Defendant nevertheless rejected Plaintiff for this position. SUF ¶ 89. The candidate ultimately chosen for this position was Robert Lobiondo ("Mr. Lobiondo").  SUF ¶ 90. Mr. Lobiondo was forty-four (44) years old at the time, six (6) years *younger* than Plaintiff.  Id.

In or around February 2009, Plaintiff applied for the position of Neuroscience Representative based in Newark, New Jersey.  SUF ¶ 91. Defendant claims to have no record of Plaintiff applying. SUF ¶ 92.  Defendant did not provide the name of the successful candidate. Defendant also did not provide the age of the successful candidate.

In or around March 2009, Plaintiff applied for the DBM Oncology position based in Michigan.  SUF ¶ 93.  Defendant rejected Plaintiff for this position.  SUF ¶ 94.  The successful candidate for Michigan DBM Oncology position was Kerry Sweeney ("Ms. Sweeney").  SUF ¶

95. Ms. Sweeney was thirty-five (35) years old at the time, sixteen (16) years *younger* than Plaintiff. Id.

In or around March 2009, Plaintiff applied for the position of Associate Manager of Regional Operations. SUF ¶ 96. Defendant rejected Plaintiff for this position. SUF ¶ 97.   The successful candidate for the position of Associate Manager of Regional Operations was Brian Raybourne ("Mr. Raybourne"). SUF ¶ 98. Mr. Raybourne was thirty-three (33) years old at the time, eighteen (18) years *younger* than Plaintiff.   Id.

In or around July 2009, Plaintiff applied for the position of MSL Trainer.  SUF  ¶ 99. She had previously applied for this position in May 2008. SUF ¶ 64. Again, Defendant rejected Plaintiff for this position.  SUF ¶ 100.  The candidate ultimately selected for the MSL Trainer position was Gregory Sapnar ("Mr. Sapnar"). SUF ¶ 101. Mr. Sapnar was forty-three (43) years old at the time, eight (8) years *younger* than Plaintiff.  Id.

In or around September 2009, Plaintiff applied for a Specialty Account Executive position.   SUF ¶ 102. Plaintiff's colleague, Adrienne Ross, wrote to Adam Lenkowsky, Defendant's Hiring Manager, to express her support of Plaintiff for this position.  Specifically, in an email dated April 3, 2009, before Plaintiff even officially applied, Ms. Ross wrote to Mr. Lenkowsky:

> I have known Sharon since she joined BMS over the past two years while I have been in L'ville.  Sharon is very customer focused and was a successful sales rep on Orencia early on, serving as both a leader within her district and within the team.  She identified customer needs, focused on the challenges of the evolving specialty pharmaceutical business and laid the groundwork for success in that district.  When Sharon moved into our Oncology training, she played a key role in the review and development of the ipilimumab training programs, even after the US redeployment.  Her willingness to provide value and work across the matrix was clear.

SUF ¶ 103. Defendant allegedly closed this position without filling it. SUF ¶ 104.

15

In or around January 2010, Plaintiff applied for the Manager of Medical Strategy position. SUF ¶ 105. Defendant rejected Plaintiff for this position. SUF ¶ 106. The candidate selected for the position was Kelly Lynne Covello ("Ms. Covello"). SUF ¶ 107. Ms. Covello was thirty (30) years old at the time, twenty-two (22) years *younger* than Plaintiff. Id.

In or around August 2010, Plaintiff applied for the Associate Director of REMS Medical Strategy position. SUF ¶ 108. Defendant rejected Plaintiff for this position. SUF ¶ 109. The candidate selected was Hedwig Bartell ("Ms. Bartell"). SUF ¶ 110. Ms. Bartell was forty-four (44) years old at the time, which was eight (8) years *younger* than Plaintiff. Id.

Finally, Plaintiff applied for the position of Associate Director of Scientific Communications in August 2010. SUF ¶ 111. Defendant rejected Plaintiff for this position. SUF ¶ 112. The candidate selected was Adeladia Sian ("Mr. Sian"). SUF ¶ 113. Mr. Sian was fifty-seven (57) years old at the time, five years older than Plaintiff. Id.

## F. After Defendant Rejected Plaintiff for Three Positions, Two of Which Were Given to Younger Candidates, Plaintiff Contacted HR on October 9, 2008.

After Defendant rejected her for the Specialty Account Manager position in Charlotte, North Carolina, Plaintiff reported concerns she had over Defendant's hiring practices to Valerie Reister ("Ms. Reister"), Human Resources. SUF ¶¶ 78, 81, 84, 114. Specifically, in an email dated October 9, 2008, Plaintiff reported to Valerie Reister ("Ms. Reister"), Human Resources, "Did not get Charlotte per a voice mail I received from RBD. . . . *A younger rep* from upstate NY got Charlotte." SUF ¶ 114. Ms. Reister acknowledged Plaintiff's concerns that at least some candidates were given preference because of age. Id. She responded via email to Plaintiff, "Sharon, if you feel you were not properly treated through this you could call the 800 Hotline number and ask for someone to review it for you. Want to talk about it." Id.

16

**G. Defendant Retaliated Against Plaintiff After She Reported Her Concerns to HR that Younger Candidates Were Selected Over Her.**

On October 9, 2008, Plaintiff made the report to Ms. Reister about what she felt were Defendant's discriminatory hiring practices.  SUF ¶ 114.  From that point forward, work was never the same for Plaintiff.  By way of example, on or around October 8, 2009, Plaintiff's then manager, Keith Zajdowicz ("Mr. Zajdowicz"), blamed Plaintiff for jobs he incorrectly believed Plaintiff did not complete as instructed.  SUF ¶ 116.

Thereafter, Plaintiff received instructions to simplify her presentations.  SUF ¶ 117.  In an email dated May 13, 2010, Plaintiff expressed concern to Mr. Zajdowicz that she was being asked to make simpler presentations.  SUF ¶ 117.  Specifically, in an email dated May 13, 1210, Plaintiff wrote, "Candice [Logan] tells me that Deryk now wants a simpler version of training to be received in the field . . . .  This simpler version is in direct conflict with Deryk telling me to raise the bar, when I started to create the system."  Id.  Then, in or around the beginning on May 2010, Candice Logan ("Ms. Logan"), Plaintiff's supervisor at the time, stripped her of an assignment.  SUF ¶¶ 118.

Plaintiff began to feel increasingly isolated from the team.  Coworkers told her that she had been stripped of projects.  Colleagues left her out of the loop.  As a result, Plaintiff requested clarification on her role.  Specifically, in an email dated May 19, 2010, Plaintiff wrote to Ms. Logan:

> I need role clarification, please.
> I can tell that Nelida is confused as to WHO is doing the training plan for the Melanoma Specialists, and so am I.
> . . . .
> Please clarify for me who you have appointed to do this.  I am not in the loop as to what is being given to Kim and how his role has been delineated to the marketing and sales leadership teams.

17

> You have given Hans the leadership role for the pre-launch and launch meetings, and I do not know what has been assigned to Kim--- so you can see, I have no idea what my role is, if nay, after the basic learning system is done.

SUF ¶ 119.

Plaintiff was also forced to ask Mr. Zadjowicz for clarification on her budget. SUF ¶ 120. Specifically, in an email dated May 20, 2010, Plaintiff wrote to Mr. Zadjowicz:

> Would you help me, please ? . . . Mary Jo [Wainwright] called me out when she saw that I did <u>not</u> have CBL baked into the timelines. When I stated that I did <u>not</u> get the funding, Mary Jo seemed annoyed as she gave Vicky [LNU] a quick look, and then Mary Jo stated, "we gave you that money months ago."

<u>Id.</u> Mary Jo Wainwright ("Ms. Wainwright") publically harassed Plaintiff over her failures to complete an assignment. In reality, however, Plaintiff was not given the funding for such assignment.

Plaintiff attempted to be proactive and correct any negative impressions of her that may have been circulating. She contacted Mr. Zadjowicz for verification that the funds had not been released. SUF ¶ 121. She received confirmation from Mr. Zajdowicz that she had not, in fact, received the funding. <u>Id.</u> In or around the middle of May, Mr. Zadjowicz wrote in an email to Plaintiff, "I did not receive approval to move forward with the $60k+ proposal for the CBL. There were no communications either via email, meeting, or phone that gave us the green light to accept the proposal and move forward with the build." <u>Id.</u>

Thereafter, in an email dated May 20, 2010, Plaintiff forwarded Mr. Zadjowicz's verification to Ms. Logan and John Cummings. She wrote:

> Please see verification from Keith Z. below regarding CBL, which I received this morning, just a minute ago. This supports what I said yesterday and is in direct conflict of what Mary Jo believes occurred. I would appreciate that Mary Jo gets clarification. Currently she believes, as does Vicky, that I have dropped the ball. Thank you for creating the best image of me.

<u>Id.</u>

18

However, it was not until sometime in the beginning of August that this budgeting misconception was finally resolved. SUF ¶ 127. Specifically, on August 7, 2010, Plaintiff sent an email to Ms. Wainwright requesting corrective action on Ms. Wainwright's part. Plaintiff wrote:

> I would very much appreciate your having a corrective conversation with John Cummings now that you reviewed the email chain establishing that throughout the early part of the year, I was working with a budget allocation of $21,000.00 (released in March) for a desktop publisher (a typist). Additionally, you are now aware that I had *no* role in MCEP, and the slow progress on that project made you very uncomfortable in the early part of the year. The impression you formulated on these two items, impacted me negatively, and there is corrective conversation needed for that repair, please.

SUF ¶ 127.

In early May 2010, Plaintiff expressed an interest in moving to the ImmunoScience team. SUF ¶ 122. In an email dated June 10, 2010, Mr. Cummings informed Plaintiff, "[A] transition to Immunoscience is no longer an option since after discussing with the Immuno marketing teams they expressed concern that you would not be a good fit with their team." Id. The next day, Plaintiff in an email to herself, wrote, "I am truly a hostage . . . . My ONLY way out of my chair is out the door---a 52 year old female with my credentials and the volume of work that I have contributed here." Id.

Ms. Logan began to micromanage Plaintiff also. SUF ¶ 123. In an email dated June 18, 2010, Ms. Logan informed Plaintiff, "I recommend that you NOT reach out to [Dr. Petit] again and instead align with Chrissy so that she can help you to get these materials from Dr. Petit when appropriate." Id. Out of frustration, Plaintiff sent herself an email, dated June 18, 2010, that read "this nonsense MUST stop[;] micro-managing me is NOT a good thing." Id.   Three days after Ms. Logan's email, Dr. Petit provided Plaintiff the requested information in an email dated June 21, 2010. Specifically, Dr. Petit wrote:

19

It is my pleasure to share the REMS materials as they will be submitted with the BLA filing. I will be attaching many files and will explain what they are below. They are just now "finalized" and were still being edited as of ASCO. The BLA is being prepared for submission on June 28, so you are getting them hot off the press!

<u>Id.</u>

In an email dated June 14, 2010, Plaintiff contacted Heather McLaughlin, Ms. Gaul's secretary, to schedule a "30 min recurring appt time with Chrissy." SUF ¶ 124. Even though the problem was controlled, in an email dated June 18, 2010, Ms. Logan instructed Plaintiff to "align with Chrissy so that she can help [Plaintiff] to get these materials from Dr. Petit when appropriate." <u>Id.</u> Plaintiff again contacted Ms. McLaughlin via email on June 21, 2010 to schedule recurring meetings. <u>Id.</u> However, Plaintiff was unsuccessful in scheduling these meetings. This added to Plaintiff's frustration in completing her assigned tasks.

Shortly thereafter, a coworker disrespected Plaintiff. In an email chain dated July 15, 2010, Kim Ching ("Mr. Ching") asked Plaintiff to provide him "an updated budget status for the MOA and CBL." SUF ¶ 125. Plaintiff responded, "MOA sow is $31,042 and CBL is $63000. Your current estimates are ok." <u>Id.</u> For some unknown reason, Mr. Ching told Plaintiff, "**What the hell kind of reply is this . . .**" <u>Id.</u> (emphasis added). Mr. Ching then admitted that the comment was from a chat to a coworker about Plaintiff. <u>Id.</u> It was never meant for Plaintiff's eyes. Supervisor Candice Logan was privy to this email conversation. <u>Id.</u> Ms. Logan received Mr. Ching's unprofessional and inappropriate response. Yet, to the best of Plaintiff's knowledge, Defendant took no disciplinary action against Mr. Ching.

Furthermore, Plaintiff did not receive adequate support or recognition from Ms. Logan. SUF ¶ 126. Plaintiff worked hard to create a valuable module. Nevertheless, Ms. Logan belittled Plaintiff via email on which other members of Defendant's staff were privy. In an email

20

dated July 28, 2010, with the subject "Typo Tattle Tales," Ms. Logan instructed Ron Chatfield ("Mr. Chatfield") to cc Plaintiff about typos. Id. At that time, Mr. Chatfield had found one typographical error in the module. In response, Plaintiff wrote to Ms. Logan and Mr. Chatfield, in an email dated July 28, 2010, "I am in receipt of learning that a typographical error has occurred in module one. The team shall be so disappointed, as everyone has worked so hard to create valuable materials." Id. Ms. Logan said nothing, however, to the proofreading staff.

In or around August 12, 2010, Ms. Logan yet again attempted to undermine Plaintiff's work efforts. SUF ¶ 128. Ms. Logan claimed that she had not received the timely delivery of materials from Plaintiff. Ms. Logan claimed this even though Plaintiff hand-delivered two copies to Ms. Logan's cubicle and presented her with a flash drive version. Id. Plaintiff was forced to turn to coworkers for assistance in proving that she had delivered the requested material. In an email dated August 12, 2010, Plaintiff asked Sheila Jentis for assistance in confirming requests for delivery. Id.

Finally, on August 12, 2010, Ms. Logan, Mr. Cummings, and Ms. Reister conducted Plaintiff's mid-year review. SUF ¶ 142. At this time, Ms. Logan read statements about Plaintiff which were untrue. Mr. Cummings presented Plaintiff with a "Written Warning." SUF ¶ 129. The Written Warning stated that Plaintiff was not meeting the Company's Performance Expectations. Id. This was the first time in Plaintiff's career with Defendant that she received ratings of "Needs Improvement." SUF ¶ 142. She also had never received a Written Warning. Id.

This Written Warning designated areas of improvement as: poor communication style and failures to embrace teamwork. SUF ¶ 129. The Written Warning also required Plaintiff to attend weekly meetings with Ms. Logan to discuss Plaintiff's progress in meeting Defendant's

goals. At this time, Defendant also assigned Plaintiff a special Confidence Based Learning ("CBL") marketing project. Id. Ms. Reister asked Plaintiff to sign the Written Warning, but she refused because the statements it contained were not true. SUF ¶ 142.

## H.  Despite the Harassing Treatment Plaintiff Faced, She Continued to Achieve.

Despite Defendant's near constant harassing and belittling of Plaintiff that occurred after she complained to Human Resources about Defendant's hiring practices, Plaintiff continued to do well. Plaintiff applied herself to her role as Manager of Oncology Training and thrived in this role.

On March 3, 2009, Defendant awarded Plaintiff Spot on Award for "Drives Performance." SUF ¶ 130. Specifically, the Award stated that Defendant presented it to Plaintiff "in appreciation of your efforts for: drives performance – Oncology POA – 2009."   Id. Similarly, in 2009 CLD, a third-party vendor, nominated Plaintiff for a Brandon Hall Excellence Award for excellence in e-learning training material. SUF ¶ 45. Plaintiff ultimately earned the Bronze Brandon Hall Award for 2009 for "Best Custom Content." Id.

At the same time, Plaintiff's coworkers continued to recognize her for her teamwork across the Company. SUF ¶ 131. By way of example, in an email dated July 15, 2009 from Mr. Zajdowicz to Plaintiff and Michael Rosenberg and Colleen Davis, Mr. Zadjowicz recognized Plaintiff "for providing assistance to the bela team." Id. This praise and recognition directly contradicted the contents of the Written Warning.

During the period of October 2008 through August 2010, when Defendant's supervisors retaliated against Plaintiff, Plaintiff continued to interview for positions throughout the Company. She consistently impressed Defendant's employees who interviewed her. SUF ¶ 132. By way of example, one of Plaintiff's interviewers, Adam Lenkowsky, wrote to Plaintiff, in an

22

email dated August 12, 2009, "I appreciate your preparation for the position as well as your enthusiasm" for working at Defendant and for new career opportunities within Defendant. Id.

Plaintiff's colleagues, and members of various teams at Defendant, continued to provide positive feedback. In an email dated October 26, 2009, Trixia Camacho ("Mr. Camacho"), a member of Defendant's Medical Strategy Team, wrote to Mr. Zajdowicz, "It has been great working with Sharon and I look forward to the continued collaboration with medical strategy and L&OD." SUF ¶ 133. Similarly, in Plaintiff's Year-End Multi-Source Feedback, dated October 26, 2009, Mr. Camacho ranked Plaintiff as "Exceeding" or "Fully Performing" in all of BMS's Core Behaviors. SUF ¶ 134. Specifically, in the narrative section, Mr. Camacho wrote, "Sharon always communicates changes in a timely fashion. She will call/e-mail/stop by to follow-up on projects and deadlines. When a concern/question is raised by the vendor she always brings it to our attention." Id. Mr. Camacho also wrote:

> It is a pleasure to have Sharon as a colleague. She is responsible, smart and diligent with her tasks and I appreciate her direct communication about topics/issues when it comes to projects we are both working on. Her follow-up on reviews are much appreciated and it keeps us all on our timeline against what the brand needs are. It is apparent that she is knowledgeable about the topics discussed during our team reviews of the modules and her experience is very valuable as we develop them. She is always prepared for meetings and does additional follow when needed. I look forward to continue working with her and gain a lot of insight from her suggestions. It is a joy to work with her.

Id.

Mr. Zajdowicz also recognized Plaintiff's outstanding performance. SUF ¶ 135. In Plaintiff's Year-End Assessment & Evaluation, dated October 29, 2009, Mr. Zajdowicz ranked Plaintiff as "Exceeding" all of her Objectives and "Exceeding" every BMS Core Value. Id. In the narrative section, Mr. Zajdowicz wrote, "Sharon contributions to the Oncology Business Unit span across all the oncology brands in 2009. This requires many sets of data, while balancing the needs of medical strategy and the sales force, in preparing L&D department needs." Id.

In line with these outstanding performance reviews, Defendant awarded Plaintiff a Certificate of Recognition in or around December 17, 2009.   The Certificate of Recognition specifically states it is "for the Core BMS Behavior: Develops and Energizes People."   SUF ¶ 136.

Plaintiff remained disappointed over Defendant's continued rejection of her applications for positions throughout the Company, however.  Nevertheless, Plaintiff maintained an excellent attitude in the workplace. SUF ¶ 137. In an email dated March 18, 2010, Mr. Zajdowicz wrote to Plaintiff, "[G]reat job driving" the Mercury Training Medical Background Support Material. Id.

Her colleagues recognized her commitment to excellence.  In an email from Nelida Rivera-Gauthier ("Ms. Rivera-Gauthier") to Plaintiff, dated March 19, 2010, Ms. Rivera-Gauthier wrote:

> I don't think that anyone doubts that you have created a solid learning system for Ipi but rather I think that they may not understand the complexity of the subject matter and that unlike other modules, you have created a system that is not typical of some training modules that rain more so to the middle of the bell curve than to the right. I appreciate that you are dedicated to training on the right side because I believe that is what makes a sales force more prepared, confident and effective in the field. Thanks for your dedication.

SUF ¶ 138.

In or around the beginning of April 2010, Mr. Zajdowicz yet again vocalized his appreciation for Plaintiff's efforts.  In an email dated April 1, 2010, Mr. Zadjowicz wrote to Plaintiff, "You are doing a tremendous job designing and developing a solid melanoma/ipi learning system. Please continue to use your experience and training to drive this process." SUF ¶ 139.  Similarly, in an email dated April 4, 2010 Mark Page expressed how impressed he was by Plaintiff.  He wrote to Plaintiff, "As always, you continue to impress me with your dedication to BMS, Oncology and the patients we serve every day." SUF ¶ 140. Maria Karasarides ("Ms.

24

Karasarides"), another coworker of Plaintiff, was also impressed with Plaintiff. In fact, on or around April 16, 2010, Ms. Karasarides nominated Plaintiff for an award through the PRI Star Award System. SUF ¶ 141. She also received awards in April, 2010 and June, 2010. SUF ¶¶ 45-48.

## I.   Plaintiff Was Qualified for the Positions at Defendant for Which She Applied.

According to a document prepared by Plaintiff for the purpose of her deposition, Plaintiff applied for a total of twenty-five (25) positions throughout the Company from February 2008 through August 2010.[4] SUF ¶ 49. Plaintiff was qualified for each of these twenty-five (25) positions. The positions for which Plaintiff applied are as follows:

(1) Associate Director, Learning Solutions;
(2) Associate Director of Business Alliance;
(3) DBM Neuroscience;
(4) Reimbursement Specialist – Atlanta, Georgia;
(5) Manager, Promotion Compliance;
(6) MSL Trainer;
(7) Associate Product Manager;
(8) Associate Director, Training;
(9) Manager Institutional Operations;
(10) Learning Manager, Hopewell;
(11) ImmunoScience/Oncology Representative, Hawaii;
(12) Specialty Account Manager – Charlotte, North Carolina;
(13) Specialty Account Manager – Philadelphia, Pennsylvania;
(14) Breast Cancer Oncology Representative – New Jersey;
(15) Neuroscience Representative – Newark, New Jersey;
(16) DBM Oncology – Michigan;
(17) Associate Manager of Regional Operations;
(18) MSL Trainer;
(19) Reimbursement Specialist;
(20) Specialty Account Executive;
(21) Manager Medical Strategy;
(22) Melanoma Specialist;
(23) Melanoma Specialist;
(24) Associate Director, REMS Medical Strategy; and
(25) Associate Director, Scientific Communications.

---

[4] Defendant contends that only eight of the positions to which Plaintiff applied and was rejected are not time-barred. Plaintiff's contention is that any positions which are time-barred as claims are relevant to Plaintiff's timely claims in that they create an inference of age discrimination.

SUF ¶¶ 49-113.

Defendant has a record of Plaintiff applying for twenty-one (21) of these positions. Defendant claims eighteen (18) of the twenty-one (21) positions were filled and that three (3) positions were closed before finding a successful candidate. Defendant did not select Plaintiff for any of the eighteen (18) positions for which Defendant has record of her applying and which were ultimately filled. SUF ¶¶ 49- 113. It is undisputed that Defendant hired an employee younger than Plaintiff for fourteen (14) of these eighteen (18) positions. Id.[5]

Defendants stated reasons for failing to hire or promote Plaintiff to these positions is pretext for the true reason, discrimination on the basis of age in violation of the ADEA and the NJLAD.

### 1. Plaintiff Applied for an MSL Trainer Position in July 2009 for Which She Was Qualified, but Defendant Rejected Her.[6]

In July 2009, Plaintiff applied for an MSL Trainer position with Defendant based in Plainsboro, New Jersey. SUF ¶ 99. Plaintiff was qualified for this position. Defendant nevertheless denied her the position. SUF ¶ 100. The MSL Trainer position is responsible for planning and training programs for employees of BMS' Medical Science Department. SUF ¶ 99.

According to the MSL Trainer position requirements posted by Defendant, a college degree, either BA or BS, was required, and an advanced degree was preferred. Id.[7] Plaintiff satisfied the educational requirements in that she possesses the required BS degree—holding

---

[5] The remainder of this section addresses Plaintiff's qualifications only for the four positions which: (1) Defendant contends are timely, (2) it has a record of Plaintiff applying, (3) Defendant hired a candidate, and (4) the successful candidate was not Plaintiff.

[6] This is one of four positions for which Defendant is not disputing the timeliness of Plaintiff's claims.

[7] Defendant incorrectly states that "[t]he position required healthcare of business-related teaching experience, and completion of a relevant advanced degree." MSJ at p. 10 (citing SUF ¶ 103 (citing Mai Decl. at ¶¶ 21-22, Exhibit F)). Internal Posting for Req 28263: MSL Trainer Position Requirements, in fact, state: "College degree *BA BS required, advanced degree preferred.* Completion of advanced degree *preferred*, healthcare or business related teaching background or experience with adult learning principals and instructional design minimum of two years of industry experience required." BMS bates stamped 2457-58 (emphasis added).

bachelor's degrees in both chemistry and biology. SUF ¶ 2. Plaintiff also possessed advanced degrees in engineering management, technology marketing management/research and development management, and a juris doctorate. SUF ¶¶ 3-4.

In terms of experience, the position required a healthcare or business related teaching background or experience with adult learning principals and instructional design, and a minimum of two years industry experience. SUF ¶ 99. The posting further required experience in providing effective training or educational presentations to a variety of audiences, including internal and external customers. Id. At this time, Plaintiff worked with Dr. Petit and other employees of Defendant to create MSL training for the United States and European Union Medical Science liaisons for Ipilmumab. Plaintiff had acted in a variety of pharmaceutical marketing/sales training positions from 1983 through the time of her application, including four (4) years with Defendant providing training presentations. SUF ¶¶ 5-7.

Despite Plaintiff's excellent credentials and direct experience, Defendant denied Plaintiff the position. SUF ¶ 100. In September 2009, Defendant hired Gregory Sapnar ("Mr. Sapnar") for the MSL Trainer position. SUF ¶ 101. At the time of his hiring, Mr. Sapnar was forty-three (43) years old, while Plaintiff was fifty-one (51) years old. Id. Mr. Sapnar was eight (8) years *younger* than Plaintiff. Id.

### 2. Plaintiff Applied for a Specialty Account Executive Position in September 2009 for Which She Was Qualified, but Defendant Rejected Her.[8]

In September 2009, Plaintiff applied for a Specialty Account Executive position based in Plainsboro, New Jersey. SUF ¶ 101. The hiring manager for this position was Adam Lenkowsky ("Mr. Lenkowsky"). SUF ¶ 103. Plaintiff applied for this position because she was

---

[8] This is one of four positions for which Defendant is not disputing the timeliness of Plaintiff's claims.

qualified in terms of educational background and work experience. In an email dated April 3, 2009, before Plaintiff even officially applied, Adrienne Ross wrote to Mr. Lenkowsky:

> I have known Sharon since she joined BMS over the past two years while I have been in L'ville. Sharon is very customer focused and was a successful sales rep on Orencia early on, serving as both a leader within her district and within the team. She identified customer needs, focused on the challenges of the evolving specialty pharmaceutical business and laid the groundwork for success in that district. When Sharon moved into our Oncology training, she played a key role in the review and development of the ipilimumab training programs, even after the US redeployment. Her willingness to provide value and work across the matrix was clear.

Id. Defendant claims, however, that this position was never filled. SUF ¶ 104.

### 3. Plaintiff Applied for a Manager of Medical Strategy Position in January 2010 for Which She was Qualified, but Defendant Rejected Her.[9]

In January 2010, Plaintiff applied for a Manager of Medical Strategy Position based in Plainsboro, New Jersey. SUF ¶ 105. The job required an advanced degree in a medical or pharmaceutical field, with one (1) to three (3) years in the pharmaceutical or related healthcare field, or clinical experience *preferred*. Id.[10]

Plaintiff interviewed for the Medical Strategy position, but was rejected. SUF ¶ 106. In February 2010, Defendant hired Kelly Lynne Covello ("Ms. Covello") as the Manager of Medical Strategy. SUF ¶ 107. The reason given for Defendant's failures to hire Plaintiff was that she had "less relevant job experience" than Ms. Covello, someone twenty-two years her junior. SUF ¶ 106. At the time of her hiring, Ms. Covello was thirty (30) years old, while Plaintiff was fifty-two (52) years old. SUF ¶ 107.

---

[9] This is one of four positions for which Defendant is not disputing the timeliness of Plaintiff's claims.

[10] Defendant incorrectly states that the job "required an advanced degree in a medical or pharmaceutical field, and experience in medical affairs, clinical research, or related experience." MSJ at p. 11 (citing SUF ¶ 118 (citing Mai Decl. at ¶ 34)).

### 4. Plaintiff Applied for an Associate Director of REMS Medical Strategy Position in August 2010 for Which She was Qualified, But Defendant Rejected Her.[11]

In August 2010, Plaintiff applied for an Associate Director of REMS Medical Strategy position based in Plainsboro, New Jersey. SUF ¶ 108. According to the Associate Director, REMS Medical Strategy Ipilimumab position description published by Defendant, the qualifications for the position are:

> Supports leadership and provides direction across US Ipilimumab medical team. Assures alignment across the US matrix organization. . . . Healthcare professional training and experience required (RN, Pharm. D, PhD, MD) Previous (2-5 years) industry experience required (this includes vendors who have worked with industry).    Industry-based Medical Information, Medical Affairs and/or Regulatory experience required.

SUF ¶ 109.

At this time, Plaintiff had worked with Dr. Robert Petit, Defendant's Director of Medical Strategy, on REMS Medical Strategy for Ipilimumab as the trainer for such content. SUF ¶ 42. While working with Dr. Petit, Plaintiff "was the driving force behind the correction, editing, and final development of these modules, overcoming a largely inadequate initial output from the vendor, to rework the modules into acceptable shape to support the US and EMEA filing of ipilimumab." Id. Therefore, Plaintiff had a high level of experience with the content.

Defendant refused to allow Plaintiff to interview, however, after they discriminated against her and placed her on a Written Warning. On August 24, 2010, Defendant stated that Plaintiff was rejected for the position of Association Director of REMS Medical Strategy because she had "less relevant job experience" than the chosen candidate, Ms. Bartell. SUF ¶ 109.

---

[11] This is one of four positions for which Defendant is not disputing the timeliness of Plaintiff's claims.

Thereafter, in or around August 2010, Defendant hired Ms. Bartell for the Associate Director of REMS Medical Strategy position. SUF ¶ 110. At the time of her hiring, Ms. Hedwig was forty-four (44) years old, while Plaintiff was fifty-two (52) years old. Id.

### J.  Plaintiff Filed Two Charges of Discrimination with the EEOC.

Plaintiff filed a Charge of Discrimination, Charge No. 530-2010-03255, with the Equal Employment Opportunity Commission ("EEOC") around August 23, 2010. Plaintiff alleged discrimination on the basis of age. SUF ¶ 142. In her Charge, Plaintiff wrote:

> I am being discriminated against because of my age, 52. Younger employees are treated more favorable by Respondent, and Respondent has engaged in a practice and pattern of discrimination against older employees. By way of example as it pertains to me, **I have applied for various positions during my tenure . . . for which I have been denied despite my qualifications. Meanwhile, younger employees are being nurtured by Respondent, selected to run meetings and handle various launches, and given positions and roles within the Company instead of me. I have actually trained some of these younger colleagues. Additionally, I have been routinely excluded from meetings and not kept informed of various work assignments and projects. Despite the above, I continue to work hard and devote myself to my job.**

> On numerous occasions, I have submitted written complaints to Respondent about the manner in which I am being treated. On August 12, 2010, Candice Logan, John Cummings and Valerie Reister conducted my mid-year review. During the review, Ms. Logan read statements about me which were untrue. Mr. Cummings presented me with a "Written Warning" which stated that I am not meeting the Company's Performance Expectations. For the first time in my career with Respondent, I received ratings of "needs improvement." Ms. Reister asked me to sign the Written Warning, but I refused because what it contains is not true.

> I believe that, in violation of the Age Discrimination in Employment Act (ADEA), I am being discriminated against because of my age (52).

Id. (emphasis added). On March 3, 2011, the EEOC issued Plaintiff a Dismissal and Notice of Rights. SUF ¶ 143.

On or about March 28, 2011, Plaintiff filed a second Charge of Discrimination with the EEOC. SUF ¶ 144. This charge was assigned Charge No. 524-2011-00698. In this Charge, Plaintiff wrote:

> I left my job with Respondent in December, 2010. In response to my EEOC charge of discrimination and my resignation, Respondent accused me of stealing information from my email account containing training programs and other scientific data belonging to Respondent. Respondent also alleged that I dumped several USB Flash Drives containing privileged information on my laptop to take home and share with my current employer, a BMS competitor. These allegations are false.

SUF ¶ 144. On or about August 31, 2011, the EEOC issued Plaintiff a Dismissal and Notice of Rights for Charge No. 524-2011-00698. SUF ¶ 145.

### K. Novartis Offered Plaintiff a Job.

Around Thanksgiving 2010, Plaintiff accepted an offer of employment from Novartis as an Associate Director of Product Training. SUF ¶ 146. Novartis offered Plaintiff a start date of November 29, 2010. SUF ¶ 147.

Medical records document that Plaintiff was extremely sick in the time leading up to her resignation from Defendant and the start of her employment with Novartis. Plaintiff was prescribed medication for her illness, including, but not limited to, numerous antibiotics. SUF ¶ 148. Plaintiff was not able to start on November 29, 2010 because of her health. Therefore, she began work on or around December 6, 2010. Id.

On December 7, 2010, Mark Osborne ("Mr. Osborne"), Executive Director, Novartis Oncology sent an email to the Novartis Sales Training Team. SUF ¶ 149. Mr. Osborne wrote, "I am pleased to announce that Sharon Piper has joined the team as Associate Director of Sales Training supporting Afinitor NET and NET Alliance." Id.

31

At the time she began working for Novartis, Plaintiff had five (5) vacation days still on the books with Defendant. SUF ¶ 150. Plaintiff was paid vacation by Defendant and salary by Novartis for the one week of overlap between the two (2) companies. SUF ¶ 151.

Plaintiff elected not to give Defendant two weeks' notice. SUF ¶ 152. "There was an incredible amount of stress being thwarted at [Plaintiff] for months. There would be no reason for [her] to reciprocate with the kindness of two weeks notice." Id. Plaintiff voluntarily resigned from Defendant.

In a letter dated December 3, 2010, Plaintiff wrote, "To Whom It May Concern: This letters serves to provide my resignation to BMS 12-3-10." SUF ¶ 154. On December 8, 2010, Jill Fenton ("Ms. Fenton"), from Educational Resources, a third-party vendor that provides services to both Defendant and Novartis, forwarded the email announcement to Mr. Cummings. SUF ¶ 153. Novartis terminated Plaintiff's employment in March 2011 because of its belief that she was working for two (2) companies at the same time. SUF ¶ 155.

## III.   ARGUMENT

### A. <u>Summary Judgment Standard.</u>

Summary judgment, "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(c)</u>. The moving party bears the burden of proving that there are no genuine issues of material fact in dispute. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-32, (1986); <u>Carter v. Exxon Co.</u>, 177 F.3d 197, 202 (3d Cir. 1999); <u>Ideal Dairy Farms, Inc. v. John Labatt, Ltd.</u>, 90 F.3d 737, 743 (3d Cir. 1996).

As clarified in <u>Anderson v. Liberty Lobby, Inc.</u>, this standard does not require that the non-moving party show through clear and convincing evidence that a jury *will* return a verdict in his favor, but simply that a reasonable jury *can* return a verdict in her favor. 477 U.S. 242, 249 (1986) (emphasis added).

In examining the evidence proffered in opposition to the summary judgment motion, the court must construe the facts and inferences in a light most favorable to the non-moving party. <u>Davis v. Township of Paulsboro</u>, 371 F.Supp.2d 611, 617 (D.N.J. 2005). The non-moving party's allegations "must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." <u>Jackson v. University of Pittsburgh</u>, 826 F.2d 230, 232 (3rd Cir. 1987), *cert. denied*, 484 U.S. 1020 (1988). Credibility issues must be decided by a jury who can see and hear the witnesses testify, not by the court, on a Motion for summary judgment. <u>Anderson</u>, 477 U.S. at 255.

In determining if summary judgment is appropriate, the court's "function is not to weigh the evidence and determine the truth of the matter," but to determine whether there are *genuine issues of material fact in dispute.* <u>Carter</u>, 177 F.3d at 202 (citation omitted). The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. <u>Goodman v. Mead Johnson & Co.</u>, 534 F.2d 566, 573 (3d Cir. 1976*), cert. denied*, 429 U.S. 1038 (1977).

Furthermore, as the Third Circuit has recognized, summary judgment is "rarely appropriate" in employment cases where intent is at issue because the question of why an employer took an adverse employment action against a plaintiff is a factual question. <u>Marzano v. Computer Science Corp. Inc.</u>, 91 F.3d 497, 509-10 (3d Cir. 1996).

33

**B. Summary Judgment is Inappropriate as to Plaintiff's Age Discrimination Claims (Counts I and III).**

Counts I and III of Plaintiff's Amended Complaint allege that the Defendant violated the Age Discrimination in Employment Act of 1967 ("ADEA") and the New Jersey Law against Discrimination ("NJLAD"), *N.J.S.A* § 10:5-12, by repeatedly failing to promote Plaintiff to various positions due to her age. Defendant argues that summary judgment should be granted on these counts. Defendant alleges that it failed to promote Plaintiff (1) because of poor performance, (2) because she was not qualified for the positions for which she applied, or alternatively, (3) that these positions were cancelled and never filled. Defendant's position is incorrect.

Sufficient evidence exists to show that there is a clear dispute as to the material fact concerning the reason for Plaintiff's denial of promotions. Defendant contends that Plaintiff was not qualified. Plaintiff contends that she was qualified and evidence supports her contention. This is an issue of material fact for the jury to decide. This evidence raises a significant doubt as to Defendant's claimed reason for its failures to promote Plaintiff. Moreover, this issue is material since it would affect the outcome of the suit. Therefore, these claims should survive and the Defendant's Motion for Summary Judgment on Counts I and III should be denied.

**1. Legal Framework for Analyzing Plaintiff's Discrimination Claims.**

In analyzing claims for age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA") and the New Jersey Law Against Discrimination ("NJLAD"), the courts apply the McDonnell Douglas three-step burden shifting analysis. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (applying the McDonnell Douglas framework to ADEA claims); Bergen Commercial Bank v. Sisler, 157 N.J. 188, 210 (1999)

34

(adopting the McDonnell Douglas framework approach "as a starting point" in analyzing claims under the NJLAD).

Where, as here, a plaintiff has not alleged any direct evidence of discrimination, she "must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a *prima facie* case of discrimination." Kautz v. Met-Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005). It is well established that a *prima facie* cause of action for age discrimination under the ADEA and NJLAD is established when the plaintiff demonstrates by a preponderance of the evidence that she:

> (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) the position was filled by someone outside of the plaintiff's protected class, or after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications.

See Erickson v. Marsh & McLennan Co., 117 N.J. 539, 569 A.2d 793 (1990).

### 2. Plaintiff Has Established a *Prima Facie* Case of Discrimination.

Plaintiff clearly satisfies the first element of the *prima facie* case as she was a member of a protected class of individuals over the age of 40. She was between fifty (50) and fifty-two (52) years old at the time she applied for, and was rejected from, twenty-five (25) positions within Defendant. SUF ¶¶ 1, 49.

Plaintiff satisfies the second element of the *prima facie* case for age discrimination as Plaintiff was repeatedly acknowledged by Defendant as being qualified for her position, not only when she was initially hired, but throughout her time at Defendant. Defendant also repeatedly acknowledged Plaintiff as possessing skills and experience that would render her an attractive candidate for promotions and other opportunities. Various employees and supervisors of Defendant acknowledged Plaintiff contributions and qualifications, including, but not limited to,

her direct supervisor, Mr. Petrozzini, and Defendant's Director of Medical Strategy, Dr. Petit. SUF ¶¶ 36-38, 42.   As stated previously, Mr. Petrozzini and Ms. Reister both encouraged Plaintiff to apply for and recommended Plaintiff's advancement within Defendant.   SUF ¶¶ 36-38. This is well documented in the record of this case.

Plaintiff satisfies the third element of the *prima facie* case as she clearly suffered from an adverse employment decision.  Defendant refused her application for twenty-five (25) positions.

Finally, Plaintiff establishes the last element of the prima facie case due to the fact that the majority these promotion positions were filled by persons younger than forty (40) years of age and/or younger than Plaintiff.   Plaintiff applied for twenty-five (25) positions from February 2008 through August 2010.  SUF ¶ 49.   Defendant claims to have record of Plaintiff applying for only twenty-one (21) of these positions. Id.  Defendant claims to have only filled eighteen (18) of these twenty-one (21) positions for which it has a record of Plaintiff applying. Id. Defendant rejected Plaintiff from all of these positions.  Id.  Fourteen (14) of the eighteen (18) successful candidate were younger than Plaintiff.  Id.  Nine (9) of those fourteen (14) were ten (10) or more years younger than Plaintiff.  Id.  Seven (7) of those fourteen were fifteen (15) or more years younger than Plaintiff. Id.

It is crucial to reiterate that the  Third Circuit has also held that the fourth element of a prima facie case of discrimination may be shown by evidence "adequate to create an inference" of discrimination. See Pivirotto v. Innovative Systems, Inc., 191 F.3d 344 (3d Cir. 1999).

The Third Circuit has held that a plaintiff in an ADEA action need not show he or she was replaced by a sufficiently younger person to prove a prima facie case. See Roach v. American Radio Systems Corp., 80 F. Supp. 2d 530 (W.D. Pa. 1999).  Plaintiff can, in fact, show that significantly younger persons were hired over her.

36

Assuming, *arguendo*, that the court can consider only those eight (8) positions which Defendant claims are not time-barred, three (3) remained unfilled and Defendant does not have a record of Plaintiff applying for a fourth. SUF ¶ 49. Of the four (4) positions that remain then, persons younger than Plaintiff filled three (3) of the four (4) positions. SUF ¶¶ 99-113. The successful candidate for the MSL Trainer position was Gregory Sapnar ("Mr. Sapnar"). Mr. Sapnar was forty-three (43) years old, which was eight (8) years *younger* than Plaintiff. SUF ¶ 101. The successful candidate for the Manager of Medical Strategy position was Kelly Lynne Covello ("Ms. Covello"). Ms. Covella was thirty (30) years old, which was twenty-two (22) years *younger* than Plaintiff. SUF ¶ 107. The successful candidate for the Associate Director of REMS Medical Strategy position was Hedwig Bartell ("Ms. Bartell"). Ms. Bartell was eight (8) years *younger* than Plaintiff. SUF ¶ 110.

Turning to the other seventeen (17) positions for which Plaintiff applied and which Defendant argues are time-barred, facts summarizing Defendant's selection of younger persons to fill these positions creates an inference of discrimination that supports the claims for the eight positions which are undisputedly not time-barred. In that regard, the Third Circuit has ruled that to meet the fourth prong in an ADEA action, a plaintiff can point to evidence creating an inference of discrimination. Roach, 80 F. Supp. 2d at 530. Even assuming, *arguendo*, the Defendant is correct in that certain claims are time-barred under the ADEA and/or the NJLAD, the Third Circuit has held the entire record should be reviewed in determining whether a plaintiff has met the causation (or fourth) element of prima facie case. Farrell v. Planters Lifesavers Co., 206 F.3d 21 (3d Cir. 2000).

In examining the entire record, the seventeen (17) positions for which Plaintiff applied and which Defendant alleges are time-barred should be considered, at a minimum, to establish an

37

inference that Defendant discriminated against Plaintiff because of her age.  Out of the seventeen (17) positions for which Plaintiff applied from February 2008 through March 2009, Defendant has a record of Plaintiff applying for fourteen (14) of the positions.  SUF ¶ 49.  Of these fourteen (14) positions, persons younger in age than Plaintiff filled eleven (11) positions for which Plaintiff was denied promotion.  SUF ¶¶ 49 – 97.  Of those successful candidates younger in age than Plaintiff, the ages ranged from one (1) year in age younger than Plaintiff to twenty-five (25) years younger than Plaintiff.  Id. Seven (7) of the eleven (11) successful candidates younger than Plaintiff were ten (10) or more years younger than Plaintiff.  Id.  This evidence is overwhelming.

Furthermore, there are inconsistent explanations from Defendant with regard to its failures to promote Plaintiff.  These inconsistencies are relevant to establishing Plaintiff's *prima facie* case.  In Farrell, the Third Circuit expressly held that evidence of inconsistencies in the employer's proffered reason for discharge, for example, could be probative of one element of a prima facie case, just as evidence of a prima facie case can be probative at the pretext stage. Id. at 286 & n.11.

In examining the entire universe of jobs for which Plaintiff applied, Defendant employer and its supervisors offered inconsistent explanations as to why it failed to promote Plaintiff.  On the one hand, Plaintiff's superiors were encouraging her and recommending her for positions.  In February 2008, her immediate supervisor, Mr. Petrozzini, recommended Plaintiff for the roles of Associate Director of Business Alliance and MSL Trainer.  SUF ¶¶ 33-34, 37.  By way of example, in an email dated April 22, 2008, Mr. Petrozzini wrote to Kim Conrad, "[M]y work experience with Sharon has been very productive, professional and pleasant.  She is very-self driven and goes above and beyond. . . .  Her unique educational platform and twenty years in this industry have prepared her well to accept new challenges when presented."  SUF ¶ 37.

38

Other employees of Defendant, including but not limited to, Ms. Conrad, Mr. Ahern and Ms. Reister recommended Plaintiff for the MSL Training position. SUF ¶ 38. In an email dated April 22, 2008, Ms. Conrad wrote to Mr. Petrozzini, "I did meet with Sharon yesterday and also feel she is a very strong candidate for the position [of MSL Training]." Id. In an email dated May 27, 2008, Ms. Reister wrote to Plaintiff, "I am in full support of you posting for the MSL Trainer position." Id. In an email dated May 25, 2008, Bill Ahern sent a letter to Plaintiff in which he wrote, "Sharon, I support you for this position based on your performance and demonstrated strengths will in L&D." Id.

On the other hand, Defendant rejected all of Plaintiff's applications on the basis that she was not qualified for said positions or had a poor attitude. SUF ¶¶ 36-38. While Defendant's inconsistent explanations are arguably not suggestive enough to be dispositive, these inconsistencies nevertheless suffice to meet the fourth or causation element of an adverse job discrimination action.

Thus, taken together, there is considerable evidence of a discriminatory motive. Plaintiff has met her burden of establishing a *prima facie* case of discrimination based on age in violation of the ADEA and NJLAD. The burden then shifts to Defendant to articulate a legitimate non-discriminatory reason for its numerous failures to promote Plaintiff.

### 3. Defendant's Stated Reasons for Its Repeated Failures to Hire Plaintiff are Pretextual.

Defendant has articulated numerous alleged legitimate, nondiscriminatory reasons for failing to promote Plaintiff: (1) Plaintiff's poor performance; (2) that she was not qualified for the positions for which she applied; or alternatively, (3) that these positions were cancelled and never filled. There is no dispute that, considering its low burden of articulating a non-

39

discriminatory reason for its numerous failures to promote Plaintiff, Defendant has satisfied this element. The burden then shifts to Plaintiff to show pretext.

Regarding the final element, Plaintiff must "come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." See Romano v. Brown & Williamson Tobacco Corp., 665 A.2d 1139, 1142 (N.J. Super. Ct. App. Div. 1995). Plaintiff has "the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination." Andersen v. Exxon Co., 89 N.J. 483, 492, 446 A.2d 486 (1982).

Defendant's stated reasons for failing to promote Plaintiff to any of the twenty-five (25) positions for which she applied are mere pretext for discrimination on the basis of age.

The Third Circuit has recognized two (2) ways in which a plaintiff can prove pretext on the part of the defendant. To defeat a motion for summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was *more likely than not* a motivating or determinative cause of the employer's action. See, e.g., Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir.1992). Thus, if the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reasons, to survive a motion for summary judgment, the plaintiff need not also come forward with additional evidence of discrimination beyond her *prima facie* case. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122-24 (7th Cir.1994); Washington v. Garrett, 10 F.3d 1421, 1433 (9th Cir.1993).

40

A plaintiff may avoid summary judgment by providing evidence rebutting the employer's proffered legitimate reasons which allows a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). See Anderson, 13 F.3d at 1124.

### a. Plaintiff Has Pointed to Evidence by Which a Fact Finder Could Reasonably Disbelieve the Employer's Articulated Non-Discriminatory Reason.

Plaintiff acknowledges Defendant's argument that a mere discrepancy in hiring qualifications is not sufficient to overcome a motion for summary judgment. In cases where the plaintiff adduces other evidence of discrimination beyond a mere discrepancy in qualifications, however, the Third Circuit has denied summary judgment because there are material facts in dispute. For example, in Bray v. Marriott Hotels, 110 F.3d 986 (3d Cir. 1997), the Third Circuit found that a plaintiff whose credentials were not obviously superior to those of the chosen candidate nevertheless could go to trial on her racially discriminatory failure to promote claim.

Viewing the evidence in the light most favorable to the plaintiff, the majority found that, despite Marriott's argument that its selection of Riehle (the successful candidate) as the best applicant was non-discriminatory, there was enough facts to enable a jury to conclude that Marriott's reason was a pretext for discrimination. The court considered the evidence of Bray's previous supervisor, whose endorsement of Bray's qualifications was at odds with the assessment of Bray by the hotel manager, creating enough disputed facts to allow the case to be presented to a jury. The majority also found that the hotel manager's "concededly inaccurate assessment of Bray" could have led a reasonable jury to conclude the decision was "driven by racial bias." Id. at 993.

41

Similar to the circumstances of <u>Bray</u>, Plaintiff has alleged that supervisors and coworkers of Defendant both recommended that she to apply to various positions within the Company, and wrote recommendations on her behalf. SUF ¶¶ 36-38.

### b.  There is a Genuine Issue of Material Fact Regarding Defendant's Motive for Its Repeated Failures to Hire.

Assuming, *arguendo*, that the Plaintiff has not sufficiently shown that the Defendant's reasons for its failures to select Plaintiff are invalid, Defendant's Motion for Summary Judgment should nevertheless be denied because there is a genuine issue of whether the motive for the Plaintiff's firing was discriminatory with respect to age. It is apparent that there is more likely than not a discriminatory motive for the failures to promote Plaintiff. Further, Plaintiff was held to a different standard than other, younger employees working at Defendant. A reasonable jury could find this as evidence of discrimination.

Additionally, Defendant's discriminatory motive in failing to promote Plaintiff is shown by the glowing recommendations that she received from members of Defendant's team including her direct supervisor, Mr. Petrozzini, Dr. Petit, a member of the medical strategy team, and Ms. Karasarides.  SUF ¶¶ 42-44.  Individuals outside of Defendant also recognized Plaintiff's achievements and skills, as third-party vendor CLD recommended Plaintiff for two different awards: (1) the Brandon Hall Excellence Award in 2009 and (2) the Association of Medical Illustrators Salon Award in 2010. SUF ¶¶ 45-48. It is hard to believe that she was not qualified for every single position for which she applied and did not receive. Regardless of how hard it is to believe, the evidence satisfies Plaintiff's burden for showing pretext such that summary judgment on Plaintiff's claims of age discrimination is not appropriate.

Taken together, there is considerable evidence of a discriminatory motive and of the completely pretextual nature of the Defendant's proffered reason for its failures to promote

42

Plaintiff to show that a genuine issue of a material fact is in dispute. As such, the Defendant's Motion for Summary Judgment should be denied.

### C. Summary Judgment is Inappropriate as to Plaintiff's Retaliation Claims (Counts II and III).

Counts II and III of Plaintiff's Amended Complaint allege that the Defendant violated the Age Discrimination in Employment Act of 1967 ("ADEA") and the New Jersey Law against Discrimination ("NJLAD"), *N.J.S.A* § 10:5-12 when it retaliated against her for engaging in protected activity. First, Plaintiff engaged in protected activity when she reported to Ms. Reister on October 9, 2008 that she believed she was being passed over for positions based on her age. SUF ¶ 114. Thereafter, Defendant retaliated against Plaintiff and consistently harassed Plaintiff. Second, Plaintiff engaged in protected activity when she filed an EEOC Charge in August 2010 alleging that Defendant unlawfully discriminated against her on the basis of age. Thereafter, Defendant contacted Plaintiff's new employer, Novartis, made accusations to Novartis that Plaintiff stole information, and caused Plaintiff to lose her job. Defendant's unlawful retaliation includes, but is not limited to, arbitrary disciplinary actions, limitation of job responsibilities and privileges, constant criticism, undermining, and micromanagement from supervisors, and other abusive and unlawful behavior.[12]

### 1. Legal Framework for Analyzing Plaintiff's Retaliation Claims.

Plaintiff brings her claims for retaliation under both the ADEA and NJLAD. Courts analyze claims for retaliation under both of the statutes in the same manner; applying the McDonnell Douglas burden shifting scheme. See, e.g., Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006). Much like the test for the age discrimination claim, a retaliation claim requires the plaintiff to first establish a *prima facie* case of retaliation.

---

[12] See Section II. G for a more in depth discussion of these adverse actions that Plaintiff never experienced before she complained of Defendant's hiring practices.

First, a plaintiff must establish a prima facie case by demonstrating that: "(1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and adverse action." Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).

Again, much like the claim for age discrimination, the defendant must then show a legitimate, non-retaliatory reason for the termination decision. See Romano v. Brown & Williamson Tobacco Corp., 665 A.2d 1139, 1142 (N.J. Super. Ct. App. Div. 1995). Should the defendant show a legitimate, non-retaliatory reason for the termination, then the burden will again shift to the plaintiff to "come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive." Id.

## 2. Plaintiff Has Established a Prima Facie Case of Retaliation.

Plaintiff has established a *prima facie* case of retaliation against Defendant. She satisfies the three elements necessary to establish such a cause of action under the ADEA and the NJLAD.

### a. Plaintiff Engaged in Protected Activity When she Complained to HR and Also When She Filed an EEOC Charge.

The first element of the *prima facie* case of retaliation is that the plaintiff must show that she was "engaged in a protected activity." See Romano, 665 A.2d at 11. A protected activity is defined by 29 U.S.C. § 623(d), "oppos[ing] any practice made unlawful by . . . section [623]." The applicable practice made unlawful by § 623 in the present case is §623(a)(1):

> to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age. As such, the action of

44

opposing the practice of "discriminat[ing] against any individual . . . because of [their] age" is a protected activity.

Id.

In this case, it is uncontroverted that plaintiff engaged in a protected activity when she filed a Charge of Discrimination on August 27, 2010 with the Equal Employment Opportunity Commission ("EEOC"). Defendant alleges that Plaintiff cannot establish retaliation because this protected activity occurred after Plaintiff faced major disciplinary action in the form of a Written Warning issued by Defendant on August 12, 2010.   However, Defendants actions within respect to Plaintiff's job at Novartis are what she contends is the subsequent retaliatory act.

Furthermore, Plaintiff also engaged in protected activity when she sent Ms. Reister ("Ms. an email dated October 9, 2008 questioning the selection of a "younger rep" instead of her for the Charlotte, North Carolina job. SUF ¶ 114.  Thus, Plaintiff has clearly satisfied part one of the three-part test to establish a prima facie case of retaliation.

### b. Defendant Subjected Plaintiff to Materially Adverse Actions.

Plaintiff satisfies part two of the three-part test because she was subjected to materially adverse actions that might well dissuade a reasonable worker making or supporting a charge of discrimination.  The Third Circuit held that "where unlawful retaliation is claimed, the plaintiff need only show that an action is 'materially adverse' in that it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Moore, 461 F.3d at 347-48 (quoting Burlington Northern and Santa Fe Ry v. Whit, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).

Defendant chooses only to focus predominately on the Written Warning Plaintiff received on August 12, 2010. This action does, in fact, constitute a materially adverse action in that it would dissuade a reasonable person in Plaintiff's position from making a charge of

unlawful discrimination.  Beyond that, however, Plaintiff was also stripped of assignments, micromanaged by her then supervisor Ms. Logan, belittled by her coworker Mr. Chang, placed into minimal roles on projects on which Plaintiff had been a lead since 2007, prevented from receiving necessary budgets, and overall, demoralized when she tried to participate in the Company work environment with her peers.

### c. A Causal Link Exists Between Plaintiff's Protected Activity and Defendant's Adverse Employment Actions.

Plaintiff satisfies part three of the three-part test because a causal link exists between the protected activity and adverse action.  Causation may be established based on temporal proximity between the protected activity and the adverse employment action for purposes of establishing a prima facie case. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). However, for timing alone to be sufficient, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). See also, Shellenbereer v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) (finding 10 days between the alleged retaliatory action and the protected activity to be sufficient); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)(finding two (2) days between the alleged retaliatory action and the protected activity to be sufficient). If the timing is not unusually suggestive of retaliatory motive, plaintiff must show other evidence of retaliatory motivation. Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004).

Plaintiff engaged in two instances of protected activity: (1) reporting age discrimination to HR and (2) filing an EEOC Charge.  After Plaintiff reported age discrimination, she suffered adverse employment actions.  These adverse employment actions include, but are not limited to: defendant continually denying her job promotions and her coworkers publically humiliating and harassing her.  These adverse employment actions took place close in time to the protected

46

activity. Also, her employment history prior to this complaint was impeccable. Furthermore, Plaintiff filed a Charge of Discrimination in August 2010. She left the Company in December 2010. Within a very short period of time thereafter, Defendant contacted Plaintiff's new employer, Novartis, and made various allegations against Plaintiff. These allegations eventually led to Plaintiff's termination in or around March 2011. Thus, Plaintiff can establish a causal link between her protected activity and Defendant's adverse employment actions against her.

For all of the foregoing reasons, this Court should find that Plaintiff has set forth a *prima facie* case of retaliation and deny Defendant's Motion for Summary Judgment with respect to these claims.

### 3. Defendant's Stated Reason for Its Disciplinary Actions is Both Pretextual and Discriminatory.

As in the age discrimination claim, Defendant claims that Plaintiff was placed on a performance plan and otherwise subjected to criticism, harassment, and otherwise treated less favorably than her coworkers for the legitimate age-neutral reason of poor performance. As discussed at great length in Part III(C)(1-3), this reason for Defendant's failures to hire Plaintiff—and the other adverse actions taken against her—is simply pretextual and has no relation to the actual cause for the adverse actions taken against her, including but not limited to, her placement on a performance plan.

Additionally, as discussed above in Part III-(C)(1-3), the true reasons for the failures to promote and the placement on a performance plan were for the discriminatory motives and had nothing to do with poor performance. Look at how she performed at Defendant before she started to voice her concerns over not getting these positions. As such, the Plaintiff satisfies the burden shifting test and has demonstrated that a significant dispute of material facts exists. Therefore,

47

the Court should also deny the Defendant's Motion for Summary Judgment in regards to Counts II and IV of Plaintiff's Amended Complaint.

### D.    The Court Should Deny Summary Judgment on Defendant's Counterclaims.

#### 1.    Plaintiff Has Not Defaulted on Defendant's Counterclaims.

On September 1, 2011, Defendant filed Counterclaims against Plaintiff.  These Counterclaims seek, among other things, disgorgement of wages, attorneys' fees, an Order compelling Plaintiff to return all of Defendant's documents and information, access to all of Plaintiff's personal computers/media devices to perform a forensic examination to determine whether all documents and information belonging to Defendant have been returned and not improperly altered, deleted or disseminated and, further, an Order barring Plaintiff from further using or disseminating Defendant's confidential information. SUF ¶ 156.

Plaintiff's counsel drafted a Reply to Counterclaims. SUF ¶ 157.  The document has not been modified or accessed since 9:21AM on September 20, 2011. Id.  Plaintiff, by and through her counsel, fully intended to file a Reply on or before September 22, 2011, but no such Reply was filed due to inadvertence or mistake on the part of counsel.  SUF ¶ 158.

Rule 60(b) of the Federal Rules of Civil Procedure deals with "Relief from Judgment or Order."  This rule gives six (6) circumstances under which he Court may vacate default, including:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by opposing party;
> (4) judgment is void;
> (5) judgment has been satisfied, released or discharged, it is based on an earlier judgment that has been reversed or vacated, or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

48

FRCP 60(b) deals with default judgments. However, any of the reasons sufficient to justify the vacation of a default judgment under Rule 60(b) normally also will justify relief from a default entry and in various situations a default entry may be set aside for reasons that would not be enough to open a default judgment. See Feliciano v. Reliant Tooling Co., Ltd., 691 F.2d 653, 656 (3d Cir. 1982). Here, it is the first circumstance-- mistake, inadvertence, surprise, or excusable neglect—which justifies denying Defendant's Motion for Summary Judgment with respect to its Counterclaims.

The Third Circuit has also stated in dicta that defendant's culpability in allowing the default is also a relevant consideration. Farnese v. Bagnasco, 687 F.2d 761, 764 (3d Cir. 1982). The Third Circuit also often emphasizes that it does not favor defaults and in close cases, doubts should be resolved in favor of setting aside the default and obtaining a decision on the merits. Id. at 764; see also Harad v. Aetna Cas. & Sur. Co., 839 F.2d 979, 982 (3d Cir.1988). "Any doubt should be resolved in favor of the petition to set aside the [default] judgment so that cases may be decided on the merits." Medunic v. Lederer, 533 F.2d 891, 894 (3d Cir.1976).

It is well settled in this Circuit that, on a motion for vacating a default under FRCP 55(c) or a default judgment under FRCP 60(b), the district court, in exercising its discretion, must consider: "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; and (3) whether the default was the result of the defendant's culpable conduct." Gold Kist, Inc. v. Laurinburg Oil Co., Inc., 756 F.2d 14, 19 (3d Cir. 1985).

Defendant will not be prejudiced if its Motion for Summary Judgment on its Counterclaims is denied. Defendant will still have its day in Court on these claims. Plaintiff, on the other hand, will be severely prejudiced if Defendant's Motion for Summary Judgment is granted. Defendant's culpable conduct contributed to

49

Plaintiff's failure to file a Reply. Defendant was aware that Plaintiff never filed a Reply. Yet, Defendant never once tried to contact Plaintiff's counsel. Defendant waited sixteen (16) months after the deadline had passed to mention counsel's mistake in a Summary Judgment Motion.

Plaintiff has attached her drafted Reply to Defendant's Counterclaims at Exhibit BB. Defendant's Motion for Summary Judgment on its Counterclaims should be denied in light of the above circumstances, combined with the strong disfavor default judgments.

### 2. Defendant's Motion for Summary Judgment Should be Denied on Its Counterclaims.

There is no evidence of record that Plaintiff engaged in any misconduct. Plaintiff did not breach her Employee Confidentiality Agreement with Defendant. Plaintiff did not convert Defendant's confidential documents and information and/or fail to return all of that information. Plaintiff did not breach her duty of loyalty to Defendant. Plaintiff was not unjustly enriched when took a new position with Novartis. She has already assured Defendant of this through certification.

Even assuming, *arguendo*, that Plaintiff engaged in any misconduct, Defendant has not produced any evidence of any damages it suffered as a result of Plaintiff's alleged misconduct.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiff Sharon Piper respectfully requests that the Court to deny summary judgment on all of Plaintiff's claims and Defendant's Counterclaims.


Respectfully submitted,

KOLLER LAW

Date: February 26, 2013          By:     _/s/DAVID M. KOLLER_____
                                          David M. Koller, Esq.
                                          Counsel for Plaintiff

50